**FEDERAL KEMPER INSURANCE**

v.

**Surena M. SICHERMAN, Administratrix of the Estate of Andrew C. Sicherman; and Robert W. Charles and Jay W. Charles; and Joseph K. Davis and Shirley A. Davis, Administrators of the Estate of Jo Ann Davis.**

Civ. A. No. 88–9757.

United States District Court, E.D. Pennsylvania.

June 20, 1990.

Kean K. McDonald, Philadelphia, Pa., for plaintiff.

Joel D. Smith, Lancaster, Pa., for defendant Sicherman.

Samuel M. Mecum, Lancaster, Pa., for defendants Charles.

Thomas J. Floyd, Jr., Lancaster, Pa., for defendants Davis.

## DECISION AND ORDER

VAN ANTWERPEN, District Judge.

### INTRODUCTION

This action for a declaratory judgment, pursuant to 28 U.S.C.A. § 2201 (West 1982 & Supp.1990), is before us on diversity jurisdiction, 28 U.S.C.A. § 1332 (West 1966 & Supp.1990). Plaintiff Federal Kemper Insurance Company ("Federal Kemper") seeks a declaration concerning a certain Automobile Insurance Policy issued to defendant Jay W. Charles, covering a 1983 Dodge Omni automobile (the "Omni"). Federal Kemper claims it is not obligated to defend or indemnify Jay Charles' son Robert W. Charles or the Estate of Andrew C. Sicherman for any liability resulting from an automobile accident involving the Omni on December 20, 1987. In that unfortunate accident both the driver of the Omni, fourteen year old Andrew Sicherman, and his passenger, eighteen year old Jo Ann Davis, were killed. The parties have filed Motions for Summary Judgment[1] and on October 21, 1989 the parties stipulated that there were no material issues of fact for a Court or a jury to determine, and that this case might be decided by the Court on the Motions for Summary Judgment. At oral argument on Friday, June 15, 1990, the parties, with Court approval, went further and agreed on the record that this Court[2] should decide this case on the merits as a non-jury matter on the basis of the following facts which they stipulated and agreed to in writing:

### STIPULATED FACTS

1. The Omni was titled in the name of Jay Charles. (R. Charles Depo. p. 25, Davis Brief, Exhibit D)

2. At one point Jay Charles considered transferring title to the Omni to Robert Charles but decided not to do so because it would have increased his insurance cost and because his agent told him the car was already insured. (J. Charles Depo. p. 53)

3. Jay Charles maintained the Omni at his expense. (J. Charles Depo. pp. 26, 84–85)

---

1. The parties filed the following motions:
 (a) A Motion for Summary Judgment in Favor of Defendants filed by Joseph K. Davis and Shirley A. Davis, Administrators of the Estate of Jo Ann Davis.
 (b) A Motion of Surena M. Sicherman, Administratrix of the Estate of Andrew C. Sicherman Joining in the Motion for Summary Judgment in Favor of Defendants filed by Joseph Davis and Shirley Davis.
 (c) A Cross–Motion for Summary Judgment of Federal Kemper Insurance Company.
 (d) A Motion for Summary Judgment in favor of Defendants Robert Charles and Jay Charles and Joinder In Part of these Defendants in the Summary Judgment Motion Filed by Joseph and Shirley Davis, including a prayer to recover the costs of defending this action which counsel agreed not to pursue at this time. This is well because we believe that at this point in time no award of counsel fees is in order merely because Federal Kemper filed this action.

2. The Stipulation of Facts does not bind the parties in the actual trial of the parties' claims in the Court of Common Pleas of Lancaster County.

4. Jay Charles, at his own expense, had maintenance performed on the brakes of the Omni as recently as October or early December 1987. (Kemper Memo, Exhibit G and Exhibit H)

5. Each user of the Omni provided gas for the car. (J. Charles Depo. p. 26)

6. The Policy was obtained by Jay Charles in his name. (Kemper Memo, Exhibit D)

7. At the time of the accident Robert Charles, was 17 years of age. (R. Charles Depo., p. 14)

8. Jay and Jean Charles adopted Robert Charles in 1977. (J. Charles Depo. p. 6)

9. For a period of two or three months before the accident Robert Charles lived away from his parent's home a great part of the time. (R. Charles Depo., pp. 7, 81–84, J. Charles Depo. pp. 4–10)

10. In the period before the accident, when not living in his parents home, Robert Charles lived with friends or in the Omni, and had no regular abode other than his parents home. (R. Charles Depo. pp. 7, 84–89)

11. In the period before the accident, while not living in his parents home, Robert Charles had possession of the Omni and his father's set of keys to the Omni, without the explicit permission of his father, however he had the implied permission of his father to use the Omni. (R. Charles Depo. pp. 84–85)

12. From the vantage point of Jay Charles, while Robert Charles was living away from home with the Omni, Robert Charles was using the Omni. During this time other family members were not using the Omni. (J. Charles Depo. p. 85)

13. During the period before the accident, while Robert Charles was not living in his parents home, Jay Charles took no steps to reclaim the Omni from his son. (J. Charles Depo. p. 79)

14. Robert Charles' parents wanted him to return home. (J. Charles Depo. p. 47)

15. Jay Charles visited Robert Charles at a friend's home while Robert was living away from home prior to the accident. (J. Charles Depo. pp. 34–36)

16. Robert Charles visited his home about one week before the accident. (J. Charles Depo. p. 29)

17. During the time he was away from home prior to the accident, Robert's possessions were at his parents' home. (J. Charles Depo. pp. 46, 67)

18. After the accident, Robert Charles returned to his parents home, where he stayed until January 1, 1988. (R. Charles Depo. p. 5)

19. Robert Charles was a member of the family of Jay Charles at the time of the accident.

20. At the time of the accident Andrew Sicherman, was 14 years and six months old. (Davis Brief, Exhibit D)

21. At the time of the accident Andrew Sicherman was not licensed to drive on the public highway. (Davis Brief, Exhibit D)

22. Andrew Sicherman had told Robert Charles that he was 16 years of age, and Robert Charles accepted his statement. (R. Charles Depo. pp. 19, 91)

23. Robert Charles believed that Andrew Sicherman did not have a driver's license. (R. Charles Depo. pp. 22, 64–65, 90–92, 99–100)

24. Robert Charles considered Andrew Sicherman his best friend. (R. Charles Depo. p. 19)

25. About two or three months before the accident Robert Charles had permitted Andrew Sicherman to drive the Omni on the public highway under his supervision. (R. Charles Depo. pp. 19, 22–24, 95–96)

26. Robert Charles described Andrew Sicherman's driving as follows: "He seemed a little jittery but I didn't see—I didn't see that there was a really any big problem that he had with driving. He seemed to handle it half decently good." (R. Charles Depo. p. 23)

27. At the time of the accident, Jo Ann Davis was 18 years old. (Davis Brief, Exhibit D)

28. Jo Ann Davis was a licensed driver. (Davis Brief, Exhibit D)

29. Jo Ann Davis knew that Andrew Sicherman had driven the Omni. (R. Charles Depo. pp. 96)

30. Jo Ann Davis had questioned Robert Charles about whether Andrew Sicherman had a driver's license. (R. Charles Depo. p. 100)

31. Jo Ann Davis told Robert Charles that Andrew Sicherman had driven her car. (R. Charles Depo. pp. 100, 112)

32. Robert Charles and Jo Ann Davis considered themselves to be boyfriend/girlfriend at the time of the accident. (R. Charles Depo. p. 13)

33. Prior to the day of the accident, Jay Charles became aware of two incidents within three weeks before the accident where Robert had permitted Jo Ann Davis and Michelle Kaplan to operate the Omni.

34. Jay Charles had expressed disapproval of Robert Charles' allowing Jo Ann and Michelle to use the Omni. (R. Charles Depo. pp. 33–34, 101, J. Charles Depo. pp. 28, 34–35, Kemper Memo, Exhibit H)

35. When Jay Charles was questioned at his deposition he stated that he was surprised that Robert Charles was not operating the Omni at the time of the accident. (J. Charles Depo. p. 39)

36. Jay Charles never gave explicit permission for Andrew Sicherman to drive the Omni. (R. Charles Depo. p. 35, J. Charles Depo. p. 39)

37. Prior to the accident, Jay Charles was unaware that Andrew Sicherman had ever driven the Omni. (R. Charles Depo. pp. 63–64, 97, J. Charles Depo. pp. 36, 38, 83)

38. Jay Charles never gave explicit permission for Jo Ann Davis to drive the Omni. (R. Charles Depo. p. 35)

39. Jay Charles never gave Robert Charles explicit permission to allow anyone other than himself to operate the Omni. (J. Charles Depo. p. 37)

40. Jay Charles never explicitly forbade Robert Charles to permit other drivers to operate the Omni. (J. Charles Depo. pp. 36–38, 76–77)

41. At the Davis home the cars were parked in such a way that the Kaplan car, with Robert Charles driving, had to be moved before the Omni, with Andrew Sicherman driving, could leave. (R. Charles Depo. p. 42–46)

42. As the cars were leaving the driveway, Robert Charles saw that Andrew Sicherman was driving the Omni. (R. Charles Depo. p. 47, Kemper Memo, Exhibit I)

43. Robert Charles did not take exception to Andrew Sicherman driving the Omni because he knew Andrew had driven it before, because he believed Andrew to be 16 years old and because Jo Ann was with Andrew. (R. Charles Depo. p. 47, Kemper Memo, Exhibit I)

44. Robert Charles did not give Andrew Sicherman explicit permission to drive the Omni on the day of the accident. (R. Charles Depo. p. 115)

45. Robert Charles did not give Jo Ann Davis explicit permission to allow Andrew Sicherman to drive the Omni on the day of the accident. (R. Charles Depo. p. 115)

46. Robert Charles did not explicitly forbid Andrew Sicherman to drive the Omni on the day of the accident. (R. Charles Depo. p. 115)

47. Robert Charles did not explicitly forbid Jo Ann Davis to permit Andrew Sicherman to drive the Omni on the day of the accident. (R. Charles Depo. p. 115)

48. At one point after leaving the Davis home, Robert Charles stopped so that the Omni, with Andrew Sicherman driving, could catch up with him. (R. Charles Depo. p. 107)

49. After the Omni caught up with him, Robert Charles continued down the road. (R. Charles Depo. p. 107)

50. Both cars stopped for a traffic light in downtown Strasburg, with the Omni, with Andrew Sicherman driving being behind the Kaplan car with Robert Charles driving. (R. Charles Depo. p. 108)

51. Robert Charles could have prevented Andrew Sicherman from operating the Omni on the public highway at the time of the accident. (R. Charles Depo. p. 105)

52. Robert Charles did not prevent Andrew Sicherman from operating the Omni on the public highway at the time of the accident. (R. Charles Depo. p. 105)

53. Paragraph 8 of the Complaint for Declaratory Judgment reads as follows:

8 On December 20, 1987, defendant, Robert W. Charles ("Robert"), who is the son of Jay, was in possession of a 1983 Dodge Omni automobile owned by Jay and insured under the Policy. On that day, he permitted Andrew C. Sicherman ("Sicherman"), a minor, to operate that automobile, even though his father had prohibited him to do so.

54. Robert testified that he knew of no incidents from which his father thought it would be alright for Andrew Sicherman or Jo Ann Davis to drive the car. (R. Charles Depo. p. 35)

55. All the terms and provisions of Simplified Auto Insurance Policy, Policy No. R 0567486 issued by Federal Kemper to Jay W. Charles on November 6, 1981, and covering the 1983 Dodge Omni are before the Court.[3]

### FACTUAL SUMMARY

As detailed in the foregoing Stipulated Findings of Facts, the plaintiff, Federal Kemper, issued an insurance policy to defendant Jay Charles on November 6, 1987 to cover the Dodge Omni automobile titled in his name (S.F.[4] Nos. 1, 55). The insurance policy contained, *inter alia*, the following provisions:

### Part I–LIABILITY COVERAGE

A. We will pay damages for bodily injury or property damage, excluding punitive damages, for which any insured becomes legally responsible because of an auto accident. We will settle or defend, as we consider appropriate, any claim or suit asking for these damages. In addition to our limit of liability, we will pay all defense costs we incur. Our duty to settle or defend ends when our limit of liability for this coverage has been exhausted. We have no duty to defend any suit or settle any claim for bodily injury or property damage not covered under this policy.

B. "Insured" as used in this Part means:

1. You or any family member for the ownership, maintenance or use of any auto or trailer.

2. Any person using your covered auto.

### EXCLUSIONS

A. We will not provide Liability Coverage for any person:

8. Using a vehicle without the permission of the owner to do so.

### DEFINITIONS

F. "Family Member" means a person related to you by blood, marriage or adoption who is a resident of your household. This includes a ward or foster child.

The family background of certain defendants is helpful to a full understanding of this matter. Defendant Robert Charles was seventeen years old at the time of the accident in 1987 and was adopted by defendant Jay Charles and his wife Jean Charles in 1977 (S.F. Nos. 7, 8). For a period of some two or three months before the accident, Robert lived away from Jay and Jean Charles' home a great part of the time (S.F. No. 9). During that period he lived with friends or in the Omni (S.F. No. 10). While living away from home, Robert's possessions remained at Jay and Jean Charles home, and they wanted him to return home (S.F. Nos. 14, 17). Robert had no regular abode other than Jay and Jean Charles' home (S.F. No. 10). Jay Charles visited his adopted son Robert at a friend's home during this period, and Robert visited Jay and Jean Charles' home about one week before the accident (S.F. Nos. 15, 16). After the accident, Robert returned to Jay and Jean

---

**3.** At oral argument in open court all parties agreed to the addition of this fact to the Stipulation.

**4.** References are to the Stipulated Findings of Fact ("SF") unless otherwise indicated.

Charles' home, and remained there until January 1, 1988 (S.F. No. 18). The parties have expressly stipulated that Robert Charles was a member of the family of Jay Charles at the time of the accident (S.F. No. 19).

The Omni was titled in Pennsylvania in the name of Jay Charles (S.F. No. 1). The Insurance Policy was also issued in Jay Charles' name and the Omni was maintained at his expense (S.F. Nos. 3, 4). At one point Jay Charles considered transferring title to the Omni to Robert, but did not do so because of increased insurance cost and because his insurance agent told the car was already insured (S.F. No. 2).

While living away from home, Robert had possession of the Omni and Jay Charles' keys to it. When he was living away from home other family members did not use the Omni. During this period, Jay Charles took no steps to reclaim the Omni from his son Robert, and the parties have expressly stipulated that Robert was using the Omni with Jay Charles' implied consent (S.F. No. 11). Shortly before the accident, Jay Charles became aware of two instances of the operation of the Omni by Jo Ann Davis and Michelle Kaplan (S.F. No. 33). Jay Charles disapproved of this (S.F. No. 34) and never gave explicit permission for Jo Ann Davis or anyone else to operate the Omni (S.F. Nos. 38, 39), although he never expressly forbade the practice (S.F. No. 40).

Most of the facts concerning the accident are also stipulated to. To provide better understanding, we have included certain additional background facts from the depositions filed in this case. We stress that we have decided this case *solely* on the stipulated facts and these additional background facts have no bearing on our decision.

At approximately 10:30 a.m. in the morning of the day of the accident, defendant Robert Charles, decedents Andrew Sicherman, Jo Ann Davis and one Michelle Kaplan were all present at Michelle Kaplan's home. (R. Charles Depo., pg. 38–39, 106). At that time, Robert Charles gave Jo Ann Davis the keys to the Omni so that she could use it to drive Michelle Kaplan to work. (R. Charles Depo., pg 38–39, 106). Jo Ann Davis was a licensed driver (S.F. No. 28). Jo Ann Davis drove Michelle Kaplan to work at a nearby shopping center in the Omni and then drove the Omni to her own home, parking it in the driveway. (R. Charles Depo., pg. 37–43). Jo Ann Davis was Robert Charles' girlfriend (S.F. No. 32) and Andrew Sicherman was his best friend (S.F. No. 24). Andrew Sicherman was 14½ years old (S.F. No. 20), although Robert Charles thought he was 16 years old (S.F. No. 22).

Around 2:00 p.m. that afternoon, Robert Charles and Andrew Sicherman left Michelle Kaplan's home in Michelle's Ford EXP and drove over to Jo Ann Davis' home, with Robert driving. (R. Charles Depo., pg. 38). They parked the Ford EXP in front of the Omni, so that the Omni could not leave the driveway until the Ford EXP was backed out first (S.F. No. 41). Robert and Andrew then went inside the Davis home.

A short time later, Robert Charles, Andrew Sicherman and Jo Ann Davis all left Jo Ann Davis' house and walked out to the driveway together. (R. Charles Depo., pg. 46). When they got to Michelle Kaplan's Ford EXP, Robert Charles told Andrew Sicherman he could go with either him or Jo Ann Davis and they should follow him. (R. Charles Depo., pg. 46, 104). Robert Charles then got into Michelle Kaplan's Ford EXP and began backing it out of the driveway. (R. Charles Depo., pg. 46–47, 103–105). When he was approximately half-way out of the driveway, he looked over and saw that Andrew Sicherman was operating the Omni and that Jo Ann Davis was a passenger (S.F. No. 42). Robert Charles knew that Andrew Sicherman did not have a driver's license (S.F. No. 23). Robert Charles did not take exception to Andrew Sicherman driving the Omni because he knew Andrew had driven it before, because he thought Andrew Sicherman was 16 years of age, and because Jo Ann Davis was with Andrew Sicherman (S.F. No. 43). In his prior driving, Andrew Sicherman had seemed to Robert Charles

to be a little jittery but without any big problem (S.F. No. 26).

After Robert Charles had backed out of the driveway, he waited until the Omni was half-way or closer to the roadway, and then he drove off down the road. (R. Charles Depo., pg. 48, 105–106). At one point, he pulled the Ford EXP over to the side of the road and waited for the Omni to catch up (S.F. No. 48). When the Omni caught up to the Ford EXP, it stopped. The parties have expressly stipulated that Robert Charles then pulled out and both cars continued on until they stopped at a red light, with the Omni directly behind the Ford EXP (S.F. Nos. 49, 50). Both cars then continued down the road, and at some point the Omni passed the Ford EXP and the two vehicles took separate routes. (R. Charles Depo., pg. 53–56). Robert Charles could have prevented Andrew Sicherman from operating the Omni if he had wanted to (S.F. No. 51), but he did not do so (S.F. No. 52).

Shortly after the vehicles separated, Andrew Sicherman attempted to pass a pickup truck on State Route 741 in Salisbury Township, Lancaster County, Pennsylvania. While attempting this, he saw another vehicle coming toward him and swerved the Omni back behind the pick-up truck. In making this maneuver he apparently lost control of the Omni. The Omni skidded along the right hand shoulder, hitting a mail box, then swerved back across the road where it went down an embankment, hit two trees, turned over and spun around. Both Andrew Sicherman and Jo Ann Davis were thrown from the Omni and killed. (Davis Memo, Exhibit D).

Following the accident, the Estate of the deceased passenger, Jo Ann Davis, notified Federal Kemper that it was bringing claims against Jay Charles, his son Robert Charles, and the Estate of the driver, Andrew Sicherman.[5] Federal Kemper then filed this declaratory judgment action asking this Court to declare that the policy issued on the insured vehicle does not pro-

vide coverage for the claims raised against Robert Charles and the Estate of Andrew Sicherman. Although it concedes coverage for the father Robert Charles, Federal Kemper argues that Andrew Sicherman did not have the requisite permission of the owner of the Omni to use it at the time of the accident. Federal Kemper also argues that Robert Charles, the adopted son of Jay Charles, in effect, used the Omni without the permission of the owner by failing to stop Andrew Sicherman from driving the Omni. Federal Kemper takes these positions based upon Exclusion 8 of the Policy which states:

> We do not provide Liability Coverage for any person:
>
> 8. *using* a vehicle without the *permission* of the *owner* to do so. (Emphasis supplied).

## DISCUSSION

There are two fundamental issues concerning the meaning of words in Exclusion 8. The first is whether the adopted son, Robert Charles, was *using* the Omni with the *permission* of its owner, Jay Charles, within the meaning of Exclusion 8 of the Insurance Policy, when he failed to stop Andrew Sicherman from driving the Omni. There is no dispute that Andrew Sicherman was using the Omni, but the second issue is whether, at the time of the accident, Andrew Sicherman was driving the Omni with the *permission* of its *owner*.

 As noted, the material facts of this controversy have been stipulated to and are therefore undisputed. Determination of the proper coverage of an insurance contract when the underlying facts are not in dispute is a question of law. *Niagara Fire Ins. v. Pepicelli et al. & Youngs, P.C.*, 821 F.2d 216 (3d Cir.1987); *Pacific Indemnity Co. v. Linn*, 766 F.2d 754, 760 (3d Cir. 1985). This case is before us on diversity jurisdiction. It involves an insurance policy delivered in Pennsylvania, covering Pennsylvania insured, and the controversy arises out of an automobile accident in

---

**5.** Suit was ultimately filed in 1989 to No. 280 of 1989 in the Court of Common Pleas of Lancas- ter County.

Pennsylvania involving residents of Pennsylvania. Therefore, Pennsylvania law applies [6]. The Supreme Court of Pennsylvania has articulated the state's "well settled" principles of insurance contract interpretation as follows:

> The goal of [the] task is, of course, to ascertain the intent of the parties as manifested by the language of the written instrument. *See Mohn v. American Casualty Co. of Reading*, 458 Pa. 576, 326 A.2d 346 (1974). Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. *See Mohn v. American Casualty Co. of Reading, supra.* Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language. *See Pennsylvania Manufacturers' Ass'n Insurance Co. v. Aetna Casualty & Surety Insurance Co.* 426 Pa. 453, 233 A.2d 548 (1967).

*Standard Venetian Blind Co. v. American Empire Insurance Co.*, 503 Pa. 300, 469 A.2d 563, 566 (1983). The Third Circuit, applying Pennsylvania law, has explained:

> "A court should read policy provisions to avoid ambiguities, if possible, and not torture the language to create them." *St. Paul Fire & Marine Insurance Co. v. United States Fire Insurance Co.* 655 F.2d 521, 524 (3d Cir.1981); see also *Urian v. Scranton Life Insurance Co.*, 310 Pa. 144, 150–51, 165 A. 21, 22–23 (1933).

"A provision of an insurance policy is ambiguous if reasonably intelligent men on considering it in the context of the entire policy would honestly differ as to its meaning." *Celley v. Mutual Benefit Health & Accident Association*, 229 Pa. Super. [475] at 481–82, 324 A.2d [430] at 434 [1974].

*Northbrook Insurance Co. v. Kuljian Corp.* 690 F.2d 368, 372, [ (3d Cir.1982) ] cited in *Niagara Fire Ins., supra* at 220.

*Liability of Robert W. Charles*

■ The claims of the Estate of Jo Ann Davis against the adopted son, Robert Charles, are primarily based on his alleged negligent entrustment of the Omni to Andrew Sicherman.[7] Federal Kemper argues that Robert Charles was *using* the Omni within the meaning of the language of Exclusion 8 of the Insurance Policy when he entrusted the Omni to Andrew Sicherman, and that this use of the Omni was without the *permission* of his father, Jay Charles, the owner of the Omni.

This brings us to the definition of the term *using* in Exclusion 8 of the Insurance Policy. The term is not defined anywhere in the Insurance Policy. Nevertheless, Federal Kemper concedes in its brief that negligent entrustment claims fall within the coverage of its Insurance Policy in accord with the opinion of the Superior Court in *Pulleyn v. Cavalier Insurance Corp.*, 351 Pa.Super. 347, 505 A.2d 1016 (1986). *See also Motorists Mutual Insurance Co. v. Kulp*, 688 F.Supp. 1033 (E.D.Pa.1988).

---

6. When federal courts sit in diversity cases, they must apply the substantive law of the states where they sit. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). When they are required to interpret or apply state law, they must consider and accept the decisions of the state's highest court as the ultimate authority regarding state law. *Ciccarelli v. Carey Canadian Mines, Ltd.*, 757 F.2d 548, 553 (3rd Cir.1985); *Connecticut Mutual Life Insurance Co. v. Wyman*, 718 F.2d 63, 65 (3rd Cir. 1983). When, however, the highest court of the state has not authoritatively considered the issue, "our disposition of such cases must be governed by a prediction of how the state's highest court would decide were it confronted with the problem." *McKenna v. Ortho Pharmaceutical Corp.*, 622 F.2d 657, 661 (3rd Cir.1980), *cert. denied*, 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980). *See also Becker v. Interstate*

*Properties*, 569 F.2d 1203, 1205 (3rd Cir.1977), *cert. denied*, 436 U.S. 906, 98 S.Ct. 2237, 56 L.Ed.2d 404 (1978). In this effort, the federal court must give "proper regard" to the relevant rulings of other court within the state. *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1965). See also *Erie Castings Co. v. Grinding Supply, Inc.*, 736 F.2d 99, 100 (3rd Cir.1984); *Wyman, supra*, 718 F.2d at 65.

7. See Restatement (Second) of Torts § 308. The complaint also claims that Robert Charles should have warned Jo Ann Davis against driving with Andrew Sicherman. The parties have not pursued this point in their briefs and we deem any issue concerning this claim to be waived.

The court in *Pulleyn* had to decide if negligent entrustment of a motor vehicle was covered under a Homeowner's Policy. The court said about negligent entrustment, 505 A.2d at page 1020:

... "although the act of negligently entrusting a motor vehicle is an essential (if not the primary) element of the tort, liability giving rise to the tort is not actually triggered until the motor vehicle is used in a negligent manner resulting in injury." *Michigan Mutual Insurance Co. v. Sunstrum*, 111 Mich.App. 98, 104, 315 N.W.2d 154, 157 (1981). *See also Insurance Company of North America v. Waterhouse, supra* [424 A.2d 675 (Del. 1980) ]; *Barnstable County Mutual Fire Insurance Co. v. Lally*, 374 Mass. 602, 373 N.E.2d 966 (1978); *Hanover Insurance Co. v. Grondin*, 119 N.H. 394, 402 A.2d 174 (1979); *Williamson v. Continental Casualty Co.*, 201 N.J.Super. 95, 492 A.2d 1028 (1985).

... Taken literally, [one] line of reasoning—that negligent entrustment of the vehicle, and not its use, is the basis of insured's alleged liability—the injured party could recover absent any showing that the incompetent to whom the vehicle is entrusted caused the injury by his negligent use of the vehicle. As we have observed, this does not comport with the elements that make up this tort concept of negligent entrustment.

. . . . .

We are persuaded by this reasoning.... [i]t is not the negligent entrustment of the automobile ... but use of it that is the basis of ... liability.

The courts have established a direct linkage between negligent entrustment and the actual use of a vehicle by operating it. Nevertheless, even though cases like *Pulleyan* gave them a good reason and good opportunity to do so, the courts have not thought of the act of merely entrusting a vehicle standing alone as a "use" of the vehicle. In addition, under the principles stated by the Pennsylvania Supreme Court, the term *using* must be construed in favor of the insured and against the insurer, the drafter of the agreement. *Standard Ve-*

*netian Blind Co., supra*, 469 A.2d at 566. We do not believe that the entrustment of the vehicle by Robert Charles to another was, standing alone, a use of the vehicle as contemplated by Exclusion 8 of the Insurance Policy.

Furthermore, even if the entrustment was a use, we feel that it was done with *permission* as the term is used in Exclusion 8 of the Insurance Policy. Under Pennsylvania law, it is clear that the permission required by exclusions like Exclusion 8 may be either express or implied. *Exner v. Safeco Insurance Co. of America*, 402 Pa. 473, 167 A.2d 703 (1961); *Donegal Mutual Insurance Co. v. Eyler*, 360 Pa.Super. 89, 519 A.2d 1005 (1987); *Nationwide Mutual Insurance Co. v. Walter*, 290 Pa.Super, 129, 434 A.2d 164 (1981). The Omni was titled in the name of Jay Charles. If he was the owner of the Omni, the stipulated facts conclusively establish that Jay Charles never gave express permission of any kind to either Andrew Sicherman or Jo Ann Davis to drive the Omni (S.F. Nos. 36, 38). There remains the question as to whether there is anything in Jay Charles' actions that should be construed to have constituted implied permission for others to operate the Omni at the time of the accident.

A well-known case which summarizes and sets forth the analytical framework of Pennsylvania law concerning implied permission is *Belas v. Melanovich*, 247 Pa.Super. 313, 372 A.2d 478 (1977). The facts of *Belas* involved a young nephew who borrowed an automobile from his aunt. He then let a friend use the automobile and the friend and a female companion were involved in an accident. Although the nephew had used the automobile some four or five times, his aunt had never said anyone else could use it. The Superior Court found no implied permission to use the vehicle. Judge Spaeth's opinion in *Belas* states, in relevant part:

The critical question will always be whether the named insured said or did something that warranted the belief that the ensuing use was with his consent. There must be a connection made with

the named insured's own conduct ... There must clearly appear a connection either expressly or impliedly between the person whose consent in necessary and the person who is intended to come within the definition of insured. (Citations omitted).

372 A.2d at 484. The Court went on to note that implied permission requires that the person claiming implied permission have a "reason to suppose" that the permission existed. Judge Spaeth also points out, in *Belas* at page 482, that social policy may dictate that the courts provide insurance coverage so long as the court does not loose sight of the "legal foundations of the problem before it."

■ This case does not involve four or five instances of use such as in *Belas, supra.* Robert Charles had the keys to the car (S.F. No. 11); Robert clearly spent a great deal of time away from home with the car (S.F. Nos. 9, 12); and his use of the Omni obviously was broad enough that Jay Charles contemplated transferring the title to Robert (S.F. No. 2). Jay Charles knew that others were using the Omni (S.F. No. 33) and although he may have disapproved, he never forbade his adopted son, Robert Charles, from letting others use the Omni (S.F. No. 40). Under the circumstances, we believe Robert Charles had implied permission for broad use of the Omni and also had "reason to suppose" he could to allow other people to use the Omni.

Nor do we think that the entrustment exceeded the implied permission because it was to an unlicensed driver. The Pennsylvania Motor Vehicle Code sections pertaining to negligent entrustment of a vehicle to an unlicensed driver, 75 Pa.C.S.A. §§ 1574, 1575 (West 1977 & Supp.1989), are summary offenses and violation of these sections can undoubtedly cause great harm. Violation of the Vehicle Code usually amounts to negligence, and in Pennsylvania, the courts have considered the entrustment of an automobile to an unlicensed underage person to be a question of negligence rather than negligence, per se, or reckless conduct. *Laubach v. Colley*, 283 Pa. 366, 129 A. 88 (1925) (boy under age 16); *Griesmer*

*v. Netter*, 273 Pa. 546, 117 A. 205 (1922) (13 year old boy). As the court said in *Chamberlain v. Riddle*, 155 Pa.Super. 507, 510, 38 A.2d 521 (1944), when confronted with an automobile accident involving a tall, 18 year old who had no driver's license:

An automobile is not regarded as a dangerous instrumentality and although it is negligence to lend an automobile to one who is known to be an incompetent driver, (*Raub v. Donn*, 254 Pa. 203, 98 A. 861) or knowingly permit a boy under the age of sixteen to operate, (*Laubach v. Colley*, 283 Pa. 366, 129 A. 88) the failure to secure a license is not conclusive evidence of incompetence: *Lloyd v. Noakes*, 96 Pa.Superior Ct. 164. Even if we were to assume that in permitting Strasser to operate his car, appellee was guilty of a violation of the penal provision of the Code, there is nothing to show that the violation was the proximate cause of minor appellant's injury.

In some states the owner is considered negligent, per se, when permission to operate a car is given to a person forbidden by law, if harm ensues from the carelessness of the operator, but in this state it has generally been held that a violation of a statute will allow a recovery by the plaintiff "only where such violation was the proximate or an efficient or 'legal' cause of the accident— that is, in the language of the Restatement—Torts—when the actor's conduct was 'a substantial factor in bringing about the harm' (Sec., 431, and Pennsylvania Annotations—See *Murphy v. Neely*, 319 Pa. 437, 179 A. 439)." *Purol Inc. v. Great East. Syst. Inc.*, 130 Pa.Superior Ct. 341, 197 A. 543....

Robert Charles' act was not of such a nature as to take it outside the legitimate implied permission of Jay Charles. While Robert Charles believed that Andrew Sicherman did not have a driver's license (S.F. No. 23), he did know that Andrew knew how to drive the Omni, having seen him drive before (S.F. Nos. 25, 26). He also had a belief that Andrew Sicherman was sixteen (S.F. No. 22). On the day of the accident, Andrew Sicherman did not drive the Omni without supervision, but was ac-

companied by a licensed 18 year old driver (S.F. Nos. 28, 43). To Robert Charles' knowledge, except for his lack of a driving permit, Andrew Sicherman's driving of the Omni on that fateful afternoon was much like that of any other beginning driver.

Federal Kemper's position must also fail from the standpoint of social policy, as set forth in *Belas, supra,* and common sense. Parents reasonably expect that when they pay for an automobile insurance policy that says it includes "family members", it will protect their children from claims arising out of the use of the parent's automobiles. If we were to adopt the approach Federal Kemper urges and pursue it to its logical end, a non-owner child sued for negligently entrusting a parent's vehicle to another would almost never be covered under an insurance policy because few parents would implicitly or impliedly permit their children to be negligent. Federal Kemper's approach would unfairly penalize those children whose parents care enough to place reasonable restrictions on them. Safety demands that parents be free to impose driving restrictions on their children without fear the insurance company will not cover the children because of the restrictions. In addition, do we not view the use Robert Charles permitted Andrew Sicherman to make of the motor vehicle as extending to an authorization to have a subsequent accident, or an acquiescence in the same. Such a view would be absurd and there is nothing in the facts to support it. Accordingly, we find that Federal Kemper has a duty to defend and indemnify Robert Charles.

*Liability of Andrew Sicherman*

█ The remaining issue is whether the driver Andrew Sicherman had *permission* from an *owner* of the Omni to operate it. The stipulated facts expressly establish that neither Jay Charles nor Robert Charles ever gave him express permission to use the Omni (S.F. Nos. 36, 44). We have already found that the adopted son, Robert Charles, had reason to suppose that his adopted father had given him implied permission to allow others to use the Omni. The question remains as to whether the fourteen year old, unlicensed driver also had reason to suppose he had implied permission to drive the Omni. The title owner, Jay Charles, did not know or have reason to know that Andrew Sicherman had driven or was going to drive the Omni (S.F. No. 37). Moreover, although Robert Charles thought Andrew Sicherman was 16 years of age, Andrew Sicherman knew he was only 14 years old. Jay Charles had given his adopted son, Robert Charles, a broad use of the Omni and although there were contacts between them, he never forbade him from letting others use the Omni, notwithstanding his knowledge of such use. Jay Charles never gave Andrew Sicherman broad use, or any use, for that matter of the Omni and there were no contacts between him and Andrew Sicherman established in the stipulated facts. Would a person in Andrew Sicherman's position really have reason to suppose an adult car owner would allow them to drive? We think not.

Accordingly, if Jay Charles was the owner of the vehicle, Andrew Sicherman did not have his express or implied permission to use it within the meaning of Exclusion 8 of the Insurance Policy. A final issue remains as to whether Jay Charles' adopted son Robert Charles was an *owner* of the Omni within the meaning of the terms of the Insurance Policy because of his parents' acquiescence in his use of the Omni. Robert Charles had allowed Andrew Sicherman to operate the Omni previously and he observed him operating it on the day of the accident and did and said nothing (S.F. No. 52). Andrew Sicherman obviously had reason to suppose that he could operate the vehicle and Robert Charles obviously gave implied permission for Andrew Sicherman to use the vehicle on the day of the accident.

Defendants cite three cases which hold that a registered title holder under the Vehicle Code, 75 Pa.C.S.A. § 1106 (West 1977 & Supp.1989), is not always the true owner of a motor vehicle. In *In re Estate of Summers*, 424 Pa. 195, 226 A.2d 197 (1967), the court held that a person who paid for and used a motor vehicle nominally titled in the name of another was the own-

er of the vehicle under a resulting trust. The nominal owner had no beneficial interest in the vehicle. *Occidental Fire and Casualty Company of North Carolina v. Brocious,* 772 F.2d 47 (3d Cir.1985) involved a sale of a truck under a written conditional sales agreement. The seller retained the title, while the buyer paid for the truck and also paid all maintenance and insurance costs. The third case, *Semple v. State Farm Mutual Automobile Insurance Co.,* 215 F.Supp. 645, 647 (E.D.Pa. 1963), dealt with a situation where a new owner paid for and took possession of an automobile and its title papers. The new owner had an accident before the formal change of title registration at a notary public had been accomplished or insurance had been procured by him. We have previously held that "the certificate of title is in no way controlling on the question of ownership and is merely some evidence of it." *Federal Kemper Insurance Co. v. Ward,* 679 F.Supp. 489, 492 (E.D.Pa.1988), *aff'd,* 860 F.2d 1074 (3d Cir.1988). *Ward* was not a parent-child situation and involved a scheme to keep insurance rates down by placing record title in someone other than the true owner.

 Unlike the cases we have just cited, in the instant case we have a seventeen year old minor operating a vehicle titled and insured in the name of his father (S.F. Nos. 1, 6). Except for some of the gasoline, Jay Charles also paid for maintenance on the Omni (S.F. Nos. 3, 4, 5) and for the insurance (S.F. No. 2). Although Robert Charles had a broad use of the vehicle, the use was still with Jay Charles' consent albeit an implied consent (S.F. No. 11). Under the circumstances, it is clear that Jay Charles could have asked for the return of the Omni anytime he wanted to. Furthermore, while Robert Charles lived away from home during a substantial part of the period preceding the accident, the facts do not show that he was self-sufficient, or that he was a fully emancipated minor. He could not have maintained the Omni on his own. His situation was not outwardly very different from that of many young people who go away to school or to summer employment with one of their parent's vehicles. Were we to hold that young people in this position are owners, they might very often find themselves without insurance coverage because of exclusion clauses like that found in *Ward, supra.* Moreover, we can find no basis in the stipulated facts for concluding that Robert Charles was the "owner" of the Omni within the meaning of Exclusion 8 of the Insurance Policy.

Consequently, even though Robert Charles gave what would amount to implied permission to Andrew Sicherman to drive the Omni at the time of the accident, Robert Charles was not in a position to act as an owner under the terms of the Insurance Policy. Therefore, Andrew Sicherman is not an "insured" within the meaning of the Policy with respect to liability arising out of the fatal accident on December 20, 1987. We know of no sound social policy which would require an insurance company to defend an unlicensed, underage person who is not a family member of the insured. Accordingly, with regard to the obligations of Federal Kemper arising out of the fatal automobile accident on December 20, 1987, we reach the following conclusions of law:

### CONCLUSIONS OF LAW

1. On December 20, 1987, the day of the accident, Robert Charles was a member of the family of Jay Charles, his father by adoption, within the meaning of the definition of "Insured" in Federal Kemper Insurance Policy No. R0567486.

2. Jay Charles is the named insured and the owner of the Omni within the meaning of the word "Owner" as used in the Exclusions of the Insurance Policy.

3. On December 20, 1987, although he did not have express permission, Robert Charles was exercising dominion and control over the Omni with the implied permission of his father, Jay Charles.

4. Robert Charles' act of not preventing Andrew Sicherman from operating the Omni on December 20, 1987 was not a use of the Omni as defined in the Insurance Policy.

5. Robert Charles' act of permitting Andrew Sicherman to operate the Omni on December 20, 1987 was with the implied permission of the owner of the Omni.

6. Federal Kemper has a duty to defend and indemnify Robert Charles for liability arising from the accident on December 20, 1987.

7. Andrew Sicherman did not have express or implied permission from Jay Charles to operate the Omni on the public highway on December 20, 1987.

8. Robert Charles never gave express permission to Andrew Sicherman to operate the Omni on December 20, 1987, although he gave what would have amounted to implied permission to do so.

9. Robert Charles is not an owner of the Omni as the term is used in the Insurance Policy and could not give permission for the use of the Omni under the terms of the Insurance Policy.

10. Federal Kemper need not defend or indemnify the Estate of Andrew Sicherman. Accordingly, it is obvious that Federal Kemper's claims have sufficient merit that they should not have to pay counsel fees or costs merely because they filed this action.